

FILED

May 16 2017, 8:03 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Leanna Weissmann | Curtis T. Hill, Jr. |
| Lawrenceburg, Indiana | Attorney General of Indiana |
| | James B. Martin |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tommy R. Pruitt, | May 16, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 15A05-1606-CR-1235 |
| v. | Appeal from the Dearborn Circuit Court |
| State of Indiana, | The Honorable James D. Humphrey, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 15C01-0109-CF-54 |

**Kirsch, Judge.**

[1] Tommy R. Pruitt ("Pruitt") was sentenced to death in 2003 for the murder of a law enforcement officer acting in the line of duty. The United States Court of Appeals for the Seventh Circuit ("Seventh Circuit") granted habeas corpus relief, vacated Pruitt's death sentence, and remanded to the trial court for re-

sentencing.  On remand, the trial court found that the aggravating factors outweighed the mitigating factors and resentenced Pruitt to a term of sixty-five years for the murder, to run consecutive to his 115-year sentence, previously imposed for other related offenses, for an aggregate term of 180 years.  Pruitt appeals raising the following restated issues:

    I.      Whether the sentence of sixty-five years for murder was prohibited under *Blakely v. Washington*;[1] and

    II.     Whether Pruitt's sentence was inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

Our Supreme Court, on direct appeal, set forth the facts regarding Pruitt's crimes as follows:

> On June 14, 2001, Morgan County Deputy Sheriff Daniel Starnes was driving his unmarked patrol car on a routine assignment serving warrants.  His son, Ryan Starnes, accompanied him as part of a college internship.  A car driven by Pruitt caught Starnes's attention and Starnes followed Pruitt for some distance, observing increasingly erratic driving.  Eventually Pruitt came to a stop and Starnes pulled in behind Pruitt's car, turned on his flashing lights, and approached Pruitt's vehicle on foot.  Starnes obtained Pruitt's driver's license and registration

---

[1] *Blakely v. Washington*, 542 U.S. 296 (2004).

and returned to his vehicle to call the information in. In response, Starnes was told that a recent robbery report suggested Pruitt might be in possession of stolen weapons. As Starnes approached Pruitt's car for a second time, Pruitt emerged with a handgun and the two exchanged gunfire. Pruitt was shot at least seven times and Starnes was struck by five shots. Pruitt also fired at Ryan Starnes, who had remained in Starnes's car.

*Pruitt v. State*, 834 N.E.2d 90, 98-99 (Ind. 2005).[2] Deputy Starnes ultimately died on July 10, 2001, and Pruitt was charged with numerous offenses, including murder.

[4] In 2003, Pruitt was found guilty of murder,[3] attempted murder, possession of a handgun without a license, resisting law enforcement, and four counts of receiving stolen property. *Id*. at 99. The jury found beyond a reasonable doubt that Pruitt killed a law enforcement officer acting in the line of duty and recommended the death penalty. *Id*. The jury then reconvened for a third phase of the trial and found Pruitt guilty of possession of a firearm by a serious violent felon as a Class B felony and possession of a handgun without a license as a Class C felony. *Id*. The jury also found Pruitt to be a habitual offender. On November 21, 2003, the trial court imposed the death penalty for the

---

[2] For clarity we refer to the proceedings at trial and on direct appeal as "*Pruitt I,*" to the post-conviction proceedings as "*Pruitt II,*" and to the federal habeas corpus proceedings as "*Pruitt III*."

[3] Pruitt was also convicted of aggravated battery, a lesser-included offense of murder.

murder and sentenced Pruitt to an aggregate term of 115 years for the remaining counts.

[5] Once Pruitt exhausted state court remedies (*see Pruitt I*, 834 N.E.2d 90 and *Pruitt v. State*, 903 N.E.2d 899 (Ind. 2009)), he sought federal habeas relief challenging the imposition of the death penalty. After Pruitt had been denied relief in federal district court, *Pruitt v. Wilson*, No. 3:09-CV-380-RLM, 2012 WL 4513961 (N.D. Ind. Oct. 2, 2012), *rev'd sub nom, Pruitt v. Neal*, 788 F.3d 248 (7th Cir. 2015)), the Seventh Circuit reversed the district court and vacated the death penalty, finding that: (1) the Indiana Supreme Court's decision that Pruitt had not shown that he is intellectually disabled was based on an unreasonable determination of the facts; and (2) Pruitt had demonstrated that he is intellectually disabled and constitutionally ineligible for the death penalty. *Pruitt v. Neal*, 788 F.3d 248, 270 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 1161 (2016). The Seventh Circuit granted a conditional writ of habeas corpus and ordered the State of Indiana to either initiate a new penalty-phase proceeding or release Pruitt. *Id*. at 276.

[6] The case was remanded to the Dearborn Circuit Court for resentencing on the murder conviction only, and on April 20, 2016, that court conducted a new sentencing hearing. The parties understood that Pruitt was to be resentenced to

a term of years for murder under Count I. *Resent. Tr*. at 4-5.[4] Pruitt raised no objections to either the original presentence investigation report ("PSI") or the probation department's 2016 update to the PSI ("PSI Update"). *Id.* at 7. During the resentencing hearing, Pruitt urged the trial court to make its findings from the evidence already in the record. Defense counsel stated:

> [A]n extensive trial in this matter and an extensive litigation regarding . . . the mental condition of our client, Mr. Pruitt[,] that occurred both prior to trial, at the penalty phase, and then at the Post-Conviction trial, which the Court also conducted. At this point, you know, that evidence is all actually already in the record before the Court. As we understand the decision of the [Seventh Circuit], essentially . . . the death penalty sentencing was overturned because of what the Court felt [was] significant evidence of intellectual disability and/or mental illness of our client, Mr. Pruitt, at the time and before, you know, this incidence occurred. And we would ask the Court to specifically note the testimony that the Court actually issued a separate order regarding what was then called, I think, "mental retardation." At that time - and heard testimony, as we understand it, from Dr. Charles Golden, Dr. Brian Hudson, and Dr. George Schmedlen.

*Id*. at 7-8.

[7] Pruitt asked the trial court to consider and take judicial notice of the entire record, including the post-conviction proceedings, in order to find intellectual disability and mental illness were mitigating circumstances. *Id*. at 7-14. The

---

[4] References to the transcript from the resentencing hearing are designated, "*Resent. Tr*. at."

State asked the trial court to consider the aggravating circumstance that Pruitt had a lengthy criminal history and that Pruitt killed Deputy Starnes in the course of his duties, the latter circumstance having been found beyond a reasonable doubt by Pruitt's 2003 jury. *Resent. Tr.* at 20. The trial court indicated that it would review the existing records from the years 2003 through 2016. *Id.* at 19.

[8] On May 2, 2016, the trial court reconvened for pronouncement of the new sentence which, as the trial court recognized, was required to reflect the sentencing scheme applicable at the time Pruitt committed murder. *Appellant's App. Vol. III* at 184 (*Resent. Order* at 2). Accordingly, Pruitt was eligible to be sentenced within a range that had a "fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances." Ind. Code § 35-50-2-3(a) (2001). The trial court reviewed the remaining 2003 convictions and their respective sentences, stating that, at that time, the circumstances "justified a finding of aggravating circumstances to aggravate those sentences and to run them consecutive [to] each other." *Resent. Tr.* at 25.

[9] The trial court "incorporate[d] all applicable findings contained in the original Pronouncement of Sentence dated November 21, 2003, for purposes of resentencing." *Id.* Pruitt did not object. The trial court stated,

> The sentences and applicable findings in that Order are
> confirmed. In addition, the Court considers the [PSI] previously

ordered and entered on November 21, 2003. As to the April 21, 2016 Sentencing, the Court considers the [PSI Update]. The Court also considers additional evidence presented in the victim's statement provided by Mrs. Starnes at that Sentencing hearing.

Additional factors considered in this matter, for purposes of Sentencing for Count I, Murder, are as follows. The Court has taken judicial notice of the evidence and trial proceedings. Evidence presented in the trial proceedings concluded in November of 2003. The Court considers the evidence presented at the hearing on Post-Conviction Relief, concluded in May of 2007. The Court considers the contents of the files in each cause of action. The Court considers the arguments and evidence presented on April 20, 2016.

*Id.* at 25-26.

[10] During resentencing, the trial court considered the following aggravating circumstances: (1) Pruitt killed Deputy Starnes while the deputy was acting in the line of duty; and (2) Pruitt had an extensive criminal history. *Resent. Tr.* at 20, 26, 27. Pruitt's criminal history included "five prior felonies, prior crimes of violence, including a Robbery and a Battery, two probation violations, and a prior firearms violation." *Id.* at 27. Pruitt had committed both state and federal crimes. *Id.* The trial court also took note of Pruitt's post-sentence behavior, as outlined in the PSI Update, which revealed a pattern of bad conduct while incarcerated, including "Battery with a Weapon, Bodily Fluid or Serious Injury, Fleeing or Interfering with Staff," and "Possession, Introduction, or Use of a Dangerous Weapon." *Id.* at 27. The trial court found that Pruitt's deliberate

and unprovoked actions toward a uniformed police officer and his "history of criminal activity and behavior indicate[d Pruitt] is a substantial risk to commit future crimes and poses a substantial danger and threat to the public." *Id*.

[11] The trial court also considered that the nature and circumstances of the crime were particularly heinous and aggravating because: (1) Pruitt used a police scanner to hear radio traffic prior to his being stopped by Deputy Starnes, thus creating "a deadly and tragic trap for Deputy Starnes"; (2) Pruitt exited his vehicle with his gun and, unprovoked, shot Deputy Starnes five times, thereby showing his intent to kill the deputy; and (3) Deputy Starnes suffered and experienced significant pain from multiple gunshot wounds until he died, almost one month later. *Id*. at 26. Additionally, the trial court considered lack of remorse. *Id*. at 27-28. Specifically, the trial court noted that, while Deputy Starnes's widow was making a statement during the *Pruitt I* sentencing hearing, Pruitt yelled, "Your husband was a fat coward." *Id*. at 28. When Mrs. Starnes continued, Pruitt yelled out, "Your son's a coward too." *Id.* The trial court found this behavior was reprehensible. *Id*.

[12] The only mitigating circumstance presented to the trial court for resentencing was Pruitt's mental status and his intellectual functioning. The Seventh Circuit had made no finding regarding the impact of Pruitt's mental status on a sentence for a term of years. *Id*. Explaining that it had heard and considered evidence regarding Pruitt's mental status and intellectual functioning as presented at trial and in post-conviction proceedings, the trial court on

resentencing noted that Pruitt did not raise an insanity defense at trial. *Id.* at 28-29. The trial court also believed that Pruitt had knowledge and understanding of the wrongfulness of his acts. *Id.* at 29. It was through the police scanner and a list of various police radio frequencies that Pruitt understood he was about to be arrested by Deputy Starnes and, therefore, exited his car with a loaded firearm and began shooting at Deputy Starnes. *Id.* Suspecting that Ryan, who remained in the patrol car, was attempting to call for help through the police radio, Pruitt also shot at him. Finally, immediately after the shooting, Pruitt stated to officers that he wished he had complied with Deputy Starnes's "request and given up." *Id.* Further evidence that Pruitt was conscious of his actions was the fact that he planned to break into a Bloomington sporting goods store, as illustrated by his possession of a Bloomington city map and his removal of the pins from the door at the rear of the sporting goods store to gain entry. *Id.* at 29-30.

[13]     During resentencing, the trial court explained that it had considered "all the evidence and circumstances . . . including defendant's mental health, mental status, and intellectual abilities," and had given "due consideration and weight [to Pruitt's mental status] as a possible mitigating factor." *Id.* at 30. The trial court found that "given all the facts, circumstances, and evidence," Pruitt's mental status did not provide an excuse for Pruitt's actions." *Id.* Balancing various factors, the trial court found that the aggravating factors "substantially outweigh[ed]" any possible mitigating factors. *Id.* Further the trial court found that the aggravating factors were sufficient to support both an aggravated

sentence and consecutive sentencing. The trial court resentenced Pruitt to the maximum term of sixty-five years for murder, giving credit for time served, and ordered that sentence be served consecutive to the 115-year term imposed during the sentencing hearing in *Pruitt I*. Pruitt now appeals.

## Discussion and Decision

## I.     Compliance with *Blakely*

[14]   Pruitt contends that, because he committed his crime on June 14, 2001, *Blakely v. Washington*, 542 U.S. 296 (2004) applies. *Appellee's Br.* at 7. Specifically, he asserts that his enhanced sentence violates the United States Supreme Court's decision in *Blakely*, because his Sixth Amendment right to have the facts supporting the enhancement of his sentence tried to a jury was violated. The State responds that Pruitt has forfeited his *Blakely* claims and, in any event, those claims are without merit. *Appellee's Br.* at 14. We agree with the State.

[15]   In *Blakely*, the United States Supreme Court held the Sixth Amendment required, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). In *Smylie v. State*, 823 N.E.2d 679 (Ind. 2005), *cert. denied*, 546 U.S. 976 (2005), the Indiana Supreme Court evaluated the constitutionality of Indiana's presumptive sentencing scheme in light of *Blakely*. Our Court held:

> [P]ortions of Indiana's sentencing scheme violate the Sixth
> Amendment's right to trial by jury, and that the new rule of
> *Blakely* should apply to all cases pending on direct review at the
> time *Blakely* was announced in which the appellant has
> adequately preserved appellate review of the sentence."

*Smylie*, 823 N.E.2d at 681-82. The *Smylie* court concluded, "it is appropriate to be rather liberal in approaching whether an appellant and [his] lawyer have adequately preserved and raised a *Blakely* issue." *Id*. at 690. Nevertheless, the *Smylie* court limited "the application of *Blakely* to any case pending on direct review . . . *subject to* the standard rules governing appellate procedure such as *waiver and forfeiture*." *Id*. at 688 (emphasis added). Assuming without deciding that Pruitt was eligible for *Blakely* treatment during resentencing, Pruitt has forfeited that argument.

[16] No later than 2005, Pruitt understood the impact of *Blakely.* On direct appeal, Pruitt unsuccessfully argued that Indiana's capital sentencing scheme violated *Blakely* by failing to require juries to find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances when recommending a sentence of death. *Pruitt I*, 834 N.E.2d at 111-12. Pruitt, however, did not mention *Blakely* during his 2016 resentencing hearings nor did he request that findings regarding mitigating and aggravating factors be made by a jury. Even when the trial court clearly set forth the factors it would take into consideration, Pruitt did not object. Instead, he requested that the trial court consider the entire paper record from *Pruitt I*, *Pruitt II*, and *Pruitt III*, to

make factual findings regarding the mitigating circumstance of his mental condition. When the trial court used that same record to find aggravating circumstances, Pruitt, again, did not object. Pruitt was resentenced long after *Blakely* was decided, but he made no objection to the fact finding of the trial court on resentencing, thereby forfeiting his *Blakely* claim.

[17] Forfeiture, however, is not the only basis upon which Pruitt's claim fails. During the resentencing hearings, the State, citing to *Davies v. State,* 758 N.E.2d 981, 986 (Ind. Ct. App. 2001), *trans. denied*, argued, "Now that the death penalty has been taken away by the [Seventh] Circuit, Indiana [l]aw, specifically the *Davies* case, allows this Court to consider that aggravating factor; that [Deputy Starnes] was a police officer [acting] in the line of duty, as an aggravating factor in sentencing Mr. Pruitt in this case." *Resent. Tr.* at 20. We agree. In *Davies*, our court held that "where defendant is eligible for either the death penalty or life without parole pursuant to Indiana Code section 35-50-2-9, but instead is sentenced to a term of years, "the trial court may consider the aggravating factors enumerated in Indiana Code Section 35-50-2-9 in addition to the factors listed in Indiana Code Section 35-38-1-7.1." *Davies*, 758 N.E.2d at 986. Here, the act of killing an officer acting in the line of duty made Pruitt eligible for the death penalty under Indiana Code Section 35-50-2-9(b)(6). While the Seventh Circuit found that imposition of the death penalty was prohibited because of Pruitt's mental status, that determination did not negate the fact that a jury had found beyond a reasonable doubt that Pruitt's act of

killing Deputy Starnes, who was acting in the line of duty, was an aggravating circumstance.

[18]     As our Supreme Court explained in *Lambert v. State*, 675 N.E.2d 1060, 1066 (Ind. 1996), *cert. denied*, 520 U.S. 1255 (1997):

> The killing of a police officer in the course of duty is a most serious crime. Police officers routinely risk their lives in the sometimes high stakes gamble of protecting society. They do a job that we all want and need done, though few of us possess the bravery and skill to do. They ask for little in return, but they do ask for some protection. The General Assembly recognized this in enacting the statutory aggravator of Indiana Code § 35-50-2-9(b)(6).

Like the facts in *Lambert*, here, "[t]he seriousness of this aggravator is magnified in the present case due to defendant's use of such deadly force to kill an unaware and unsuspecting police officer in an otherwise nonviolent and ordinary [stop]." *Id.* at 1066 (citing *Spranger v. State*, 498 N.E.2d 931, 960 (Ind. 1986), *cert. denied*, 481 U.S. 1033 (1987) (noting that "[t]he manner, the motivation, and other attendant circumstances of the offense are the type of considerations which may augment the value of this aggravating circumstance"). It was proper for the trial court to consider the aggravating factors that Pruitt killed an officer acting in the line of duty and that Pruitt had an extensive and serious criminal record. *See Davis v. State*, 835 N.E.2d 1087, 1088 (Ind. Ct. App. 2005) ("Use of prior criminal history as an aggravator is exempt from *Blakely*'s jury fact-finding requirement.").

[19]     While Pruitt contends that the trial court's consideration of the other aggravating circumstances violated *Blakely*, we need not reach that issue. Our Supreme Court has said, "Where the use of some aggravators violates *Blakely* and others do not, we will remand for resentencing *unless* we can say with confidence that the trial court would have imposed the same sentence if it considered only the proper aggravators." *Robertson v. State,* 871 N.E.2d 280, 287 (Ind. 2007). In this case, we find remand for resentencing is not warranted.

[20]     Pruitt killed an officer in the line of duty and had an extensive criminal record. At resentencing, Pruitt relied on the status of his mental health as a mitigating circumstance. While we agree that Pruitt's mental health is a mitigating factor, we note that this issue was raised at each phase of this case, during trial, on direct appeal, during the post-conviction proceedings, and during the federal habeas proceedings. Without even considering the aggravating circumstance that Pruitt had a significant criminal history, the jury in *Pruitt I* found beyond a reasonable doubt that killing an officer in the line of duty was an aggravating factor that outweighed the mitigating factor of Pruitt's mental health.

[21]     Starting with the then-presumptive sentence of fifty-five years, the trial court could have aggravated Pruitt's sentence to sixty-five years and ordered his sentences to run consecutively based on a single aggravating factor. *See Gleason v. State*, 965 N.E.2d 702, 712 (Ind. Ct. App. 2012) (same, single aggravator may be used both to enhance presumptive sentence and to justify consecutive sentences); *McGinity v. State*, 824 N.E.2d 784, 789 (Ind. Ct. App. 2005) (one

aggravator is sufficient to justify a sentence enhancement), *trans. denied*. The trial court found at least two aggravating circumstances that complied with *Blakely*. The trial court also found that Pruitt's mental status was a mitigating factor. However, addressing Pruitt's mental status, the trial court explained, "there is evidence which indicates that the defendant had knowledge and understanding of the wrongfulness of his acts." *Resent. Tr*. at 29. Based on Pruitt's use of the scanner, planning of the robbery, and regret that he did not comply with Deputy Starnes's request, the trial court diminished the significance of Pruitt's mental status as a mitigating circumstance for resentencing. Here, the trial court had to balance two significant aggravating factors against the mitigating factor of Pruitt's mental condition. Because we can say with confidence that the trial court would have imposed the same sentence had it considered only the aggravators that complied with *Blakely*, we find no error.

## II.   Inappropriateness of Sentence

[22]   Pruitt also argues that his sentence is inappropriate. Under Indiana Appellate Rule 7(B), we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The imposition of consecutive sentences may also be deemed inappropriate. *See Bell v. State*, 881 N.E.2d 1080, 1087 (Ind. Ct. App. 2008) (maximum consecutive sentences for three controlled buys in same

investigation was inappropriate), *trans. denied*. "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Dupree v. State*, 51 N.E.3d 1251, 1259 (Ind. Ct. App. 2016) (quoting *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied*), *trans. denied*.

[23]     The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). "This determination turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Myers v. State*, 27 N.E.3d 1069, 1081-82 (Ind. 2015) (citations and internal quotation marks omitted). "We recognize that [t]he principal role of appellate review should be to attempt to leaven the outliers . . . but not to achieve a perceived 'correct' result in each case." *Id*. at 1082 (citations and internal quotation marks omitted). It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State*, 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied*.

[24]     When determining whether a sentence is inappropriate, we recognize the presumptive sentence as the starting point the legislature has selected as

appropriate for the crime. *Weiss v. State,* 848 N.E.2d 1070, 1072 (Ind. 2006). At the time Pruitt committed the crime, the presumptive sentence for murder was fifty-five years. At the time of resentencing, Pruitt was already facing an aggregate term of 115 years for the attempted murder of Ryan, for four counts of receiving stolen property, i.e., firearms, for possession of a firearm by a serious violent felon, and for a habitual offender finding. The burden is on Pruitt to persuade us that a sentence of sixty-five years, served consecutive to the earlier sentence of 115 years, is inappropriate in light of the nature of the offense and the character of the offender. Pruitt has not met that burden.

[25] The nature of this offense was egregious. While Deputy Starnes and his son were serving warrants, they observed Pruitt engaging in increasingly erratic driving. Eventually, Pruitt came to a stop, and Starnes pulled in behind Pruitt's car, turned on his flashing lights, and approached Pruitt's vehicle on foot. Starnes obtained Pruitt's driver's license and registration and returned to his vehicle to call in the information. In response, Starnes was told that a recent robbery report suggested Pruitt might be in possession of stolen weapons. Pruitt had in his car a police scanner and a list of radio frequencies used by law enforcement, which allowed him to hear Deputy Starnes's exchange. Pruitt, who had stolen firearms in his car, did not want to be arrested. As Starnes approached Pruitt's car for a second time, Pruitt emerged with a handgun, and the two exchanged gunfire. Pruitt's intent to kill Deputy Starnes was reflected in his act of essentially ambushing Deputy Starnes. Further, once Pruitt saw Deputy Starnes's son, Ryan, trying to call for help on the squad car's radio,

Pruitt also shot at Ryan. Ryan saw his father get shot multiple times. Deputy Starnes lingered in great pain for a month before dying, leaving behind a widow and children.

[26] Regarding Pruitt's character, Pruitt's criminal history included "five prior felonies, prior crimes of violence, including a Robbery and a Battery, two probation violations, and a prior firearms violation." *Resent. Tr*. at 27. Pruitt had committed both state and federal crimes. *Id*. The trial court also took note of Pruitt's post-sentencing behavior, as outlined in the PSI Update, which revealed a pattern of bad conduct while incarcerated. That pattern included, "Battery with a Weapon, Bodily Fluid or Serious Injury, Fleeing or Interfering with Staff," and "Possession, Introduction, or Use of a Dangerous Weapon." *Id*. The trial court found that Pruitt's deliberate and unprovoked actions toward a uniformed police officer and his "history of criminal activity and behavior indicate[d Pruitt] is a substantial risk to commit future crimes and poses a substantial danger and threat to the public." *Id*. Pruitt's character was also reflected during the sentencing hearing in *Pruitt I*. Deputy Starnes's widow was reading a prepared statement to the trial court when Pruitt interrupted her and yelled, "Your husband was a fat coward." *Id*. at 28. Mrs. Starnes continued, and shortly thereafter, Pruitt, again, yelled out, "Your son's a coward too." *Id*. The trial court found this behavior was reprehensible. *Id*.

[27] There is no question that Pruitt suffers from mental issues and has been diagnosed with some form of schizophrenia. The specifics of Pruitt's mental

challenges were set forth in *Pruitt I*, *Pruitt II*, and *Pruitt III*. Those issues, however, did not prompt defense counsel to pursue an insanity defense. Additionally, Pruitt seemed lucid on the day of the murder; he had a police scanner inside his vehicle, and after encountering Deputy Starnes, he listened to the scanner. It was at that time that Pruitt understood he would be arrested if Deputy Starnes found the stolen firearms in his car. Pruitt exited his car with a firearm in hand and shot Deputy Starnes. Pruitt argues that the trial court "unfairly ignore[d] what was going on behind the scenes with Pruitt's untreated schizophrenia and low mental functioning," when it "harshly judged Pruitt for having a police scanner and firing on an officer without provocation." *Appellant's Br.* at 30. In compliance with Pruitt's request, the trial court accommodated Pruitt's request to look carefully at the evidence regarding his mental capacity and functioning, and properly determined that Pruitt deliberately elected to shoot Deputy Starnes to avoid arrest and was fully aware of the wrongfulness of his conduct. We agree with the trial court on resentencing. Accordingly, Pruitt's sentence is not inappropriate in light of the nature of the offense and the character of the offender.

[28] Affirmed.

[29] Robb, J., and Barnes, J., concur.